UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **AUTOMATION GUARDING SYSTEMS, LLC**, <br><br> Plaintiff, <br><br> vs. <br><br> **INDUSTRIAL STEEL GUARDING, LLC, et al.,** <br><br> Defendants. | 2:21-CV-10221-TGB-APP <br><br><br> **ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

In 2019, Plaintiff Automation Guarding Systems ("AGS") discovered irregularities in its financial records and hired a forensic accountant to investigate. Based on the results of that investigation, Plaintiff brought this lawsuit against the Defendants, two former employees and companies they founded, alleging that they had set up a shell company to embezzle money from AGS while still employed there and eventually used that money to fund a rival company. Plaintiff has now filed a motion for partial summary judgment, seeking resolution of two counts of its Complaint. ECF No. 38. For the reasons that follow, that Motion will be **GRANTED.**

1

## I. BACKGROUND

AGS is a Michigan corporation which manufactures safety fencing for industrial uses. It is jointly owned and managed by Neil Wiebe and his spouse Margaret. Wiebe Dep. 16-17, ECF No. 38-1, PageID.826-27. Defendant Andi Papa was involved with and employed by AGS since its inception in 2004, having worked with Neil Wiebe at several prior companies. ECF No. 38, PageID.778. Evis Kola was hired by AGS in 2012. *Id.* at PageID.779.

Kola and Papa incorporated a new company, Industrial Steel Guarding LLC ("ISG"), in October 2015. *Id.* at PageID.782. After ISG was formed, it contacted several AGS customers and represented ISG as a "reseller" of AGS products. *See, e.g.,* Pl's Ex. 6 ("ISG Letter"), ECF No. 38, PageID.782. ISG then began selling AGS product to some of these customers. Occasionally, ISG made some payments to AGS.

There is no disagreement on these basic facts, but the parties take different positions on whether ISG's business was a front for embezzlement, or an authorized re-seller, operating with AGS's permission. Plaintiff alleges that from 2015 through January 2018, Kola and Papa executed a scheme to improperly divert customers and product away from AGS to enrich themselves. It says Kola and Papa would sell AGS product to third parties without ever paying AGS: they would use AGS systems to fulfill and ship out the orders, and then hide the transactions by manipulating AGS's accounting records, so AGS never

knew it had sent out product for which it had not received payment. Kola and Papa would then collect payments for the orders and funnel them directly to ISG. ECF No. 38, PageID.783-784. Defendants say they had permission to resell AGS products, and that they paid AGS for any of its products sold. Defendants state that any sales revenue earned by ISG without corresponding payments to AGS comes from the resale of other products, which they allege they acquired from third-party Chinese vendors. ECF No. 39, PageID.1811-12; ECF No. 38, PageID.797; *see also* Kola Dep. 40:24-41:8, ECF No. 38-1, PageID.1152-53.

In August 2017, Kola and Papa opened a new company, Steel-Guard Company LLC. In January 2018, the two resigned from AGS, wound down ISG, and continued operating Steel-Guard Company LLC. That company changed names to RoboFence and is still in operation; Kola and Papa both still work there. ECF No. 38, PageID.781, 784-85.

The inquiry that led to this case began when a long-time customer contacted AGS in mid-2019—after Kola and Papa had left—with a question about an AGS product it had bought. The customer attached an ISG purchase order as a reference, believing that ISG had sold AGS products legitimately. This led AGS owner Neil Wiebe to discover that Kola and Papa had been operating ISG while still at AGS. He then discovered inconsistencies in AGS records related to sales made to ISG and hired a forensic accountant to conduct a financial audit. ECF No. 38, PageID.785-87. This accountant reviewed all of AGS's financial

documentation from the time period in question, as well as non-party records and ISG records and bank statements obtained by subpoena.

The forensic accountant's report, largely summarized in his affidavit (Bagalis Aff., ECF No. 38-1, PageID.1209), identified 169 instances where AGS product was released for shipment to AGS customers with *ISG* identified as the entity that would receive payment. Bagalis Aff. ¶ 30, PageID.1219. It found these transactions totaled $967,109 in AGS product. However, only $66,105[1] in payments could be identified as having been made by ISG to AGS, leaving at least $901,004 outstanding in the preliminary analysis. *Id.* at ¶¶ 32, 36. The accountant then analyzed further records subpoenaed from non-parties (that is, purchasers of AGS products who bought from ISG) to cross-reference any inconsistent transactions in the AGS system. *Id.* at ¶ 40. He found that "it is reasonable to conclude Kola and Papa were in control of AGS products, transferred AGS products to AGS customers, and fulfilled customer orders that were invoiced through ISG allowing ISG to collect

---

[1] The Court notes that there are some discrepancies as to the exact amount paid by ISG to AGS when comparing both sides' briefing and the Bagalis Affidavit. After reviewing the underlying documentation, specifically the scans of checks at Plaintiff's Ex. 11, ECF No. 38-2, PageID.1496, the Court believes that the amount from the Bagalis Affidavit is the correct number and attributes any other figures to typographical error.

4

$938,481 as payment on AGS products without corresponding accounting entries reflecting ISG owed AGS for that product."[2] *Id.* at ¶ 57.

Defendants in their initial disclosures provided slightly different numbers, stating that ISG purchased about $74,000 of product from AGS and made about $66,000 of payments towards that debt. They do not dispute that ISG's total sales were close to $1 million; they dispute, however, the allegation that all those sales were generated from selling AGS products. Instead, they allege they were selling some AGS products, but mostly products from a third-party Chinese vendor. *Id.* at ¶ 49; *see also* ECF No. 38, PageID.797. The accountant was unable to corroborate this claim.

Plaintiff's motion seeks summary judgment on two claims: Count IV (common law conversion) and Count V (statutory conversion under MCL 600.2919a).

## II. STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013);

---

[2] Given the aforementioned typographical errors, this number appears as "$938,281" in some parts of Parties' briefing; the Court will use the figure from the Bagalis Affidavit throughout this Order.

*see also* Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A. Common law conversion (Count IV)

Plaintiff seeks summary judgment on its claim of common law conversion. Michigan common law defines conversion "any distinct act of dominion wrongfully exerted over another's personal property." *Tyson v. Sterling Rental, Inc.*, 836 F.3d 571, 580-81 (6th Cir. 2016) (quoting *Trail Clinic, P.C. v. Bloch*, 319 N.W.2d 638, 640 (Mich. Ct. App. 1982)). Plaintiff defines the property at issue for purposes of this count as the "$938,481 of product that was sold by ISG between November 2015 and December of 2017." It cites as evidence the Bagalis Affidavit, where the forensic accountant indicates that significant quantities of AGS product totaling $938,481 were sold by ISG without payment to AGS. Bagalis Aff. ¶¶ 36, 57, ECF No. 38-1, PageID.1209.

Defendants say there is at least a question of material fact regarding whether they wrongfully exerted control of AGS's property. They say there was a purported "verbal agreement" between Wiebe, Papa, and Kola, in which Wiebe allegedly gave them permission to resell AGS product. They say that the existence of this contract means that the economic loss doctrine applies to this case, according to which a tort claim such as conversion cannot be maintained because the conduct at issue constitutes breach of a contract. ECF No. 39, PageID.1818-22.

When parties are operating under a contract, the economic loss doctrine does prevent recovery under tort theories if the injury claims are

7

related to performance or non-performance under the contract. The purpose of the economic loss doctrine is to separate tort and contract claims, and to prevent recovery in tort for something that should have been "bargained for" under the contract terms, such as a product liability claim. *See Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612, 616 (Mich. 1992) (discussion of the rationale behind adopting economic loss doctrine in certain cases at the boundary of contract and tort). To state a tort claim despite the existence of a contract, a plaintiff must show some duty independent of the contract that was breached. *Sherman v. Sea Ray Boats, Inc.*, 649 N.W.2d 783, 788 (Mich. Ct. App. 2002) ("It has often been stated that the sometimes hazy distinction between contract and tort actions is made by applying the following rule: if a relation exists that would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise it will not.").

As evidence of a contract, Defendants point to the deposition testimony of Papa and Kola. Papa stated that Wiebe gave them a generalized permission to resell, and that he encouraged any employee to do so. Papa Dep. 48-53, 65-67, ECF No. 38-1, PageID.994-99, 1011-13 ("I don't remember exactly what they were. But there were some arrangements made that we could resell their product"; "Mr. Wiebe had told numerous people to just go ahead and start up a business and as long as they can sell these products, he's happy with that"; "I don't recall exactly the details of the understanding, but we were told that we could

8

resell the product, yes."). Kola remembers a "lunchroom" conversation that took place on the topic, and also said that Wiebe "always said that anybody that wants to open a business, they could resell my product at any time." Kola Dep. 31-32, 35, 40-41, ECF No. 38-1, PageID.1144-45, 1148, 1153-54 ("I don't recall specifically [what Wiebe said.] I know that he said that it's okay to resell because it would help him with office work, being away from his desk"; "Industrial Steel Guarding is open because Neil Wiebe said that it's okay for [us] to resell."). Wiebe does not recall ever giving this permission. Wiebe Dep. 44, 46, 63, 73, 98, 105-106, ECF No. 38-1, PageID.854, 856, 873, 883, 908, 915-16 ("I don't remember the conversation like that"; "That's correct [that ISG was never authorized by AGS to be a reseller of the product].").

Despite the conflicts in these testimonies, the relationship that both parties describe existing between them does not demonstrate any verbal contract to resell. Both Kola and Papa speak of "permission" to resell at a high level, or "encouragement" to resell of some kind. Wiebe recalls no such permission being discussed. But even taking Kola and Papa's version of the events as true, "permission" does not equate to the offer, acceptance, and consideration needed to create a contract. While there may be an issue of fact as to whether Wiebe ever discussed reselling or "side-business" opportunities with his employees, the evidence is completely devoid of the kind of alleged facts that would raise a question of whether there was an oral contract.

And even if there was some issue of fact about a contract, a "reselling" agreement logically implies that Company B *first* buys product from Company A, and *then* sells it to a third entity. There is no evidence that what Kola and Papa did would fall under a contract to "resell" AGS products. They were undisputedly taking AGS products, selling them, and *then* (sometimes or rarely) paying AGS after the fact. This is not "reselling;" it is just selling.[3] Wiebe also testifies that this was not how his "reseller" arrangements with other companies worked. For example, when speaking of a Canadian reseller Ark Automation: "He buys it from us, and he designs it into his product that he sells, and that's it. He buys it, he sells it." Wiebe Dep. 47:23-25, ECF No. 38-1, PageID.857; *see also* 49:16-20, PageID.859.

So Defendants' theory regarding contracts and the economic loss doctrine is unavailing. Even without a contract, however, ISG would be in the clear if it paid AGS for anything that it sold: there would be no "wrongful" exertion of control over property if ISG paid for it like any other customer. ISG does not dispute that its total revenue over the course of its operations was close to $1 million, as cited by Plaintiff's

---

[3] Defendants also attempt to argue that the transactions between AGS and ISG, scant though they are, are evidence of a contract. ECF No. 39, PageID.1822. But individual sales contracts between a business and a customer, without more supporting context, are not evidence of a broader, ongoing contract to "resell," especially when the "sale" to a new customer has happened *before* the first customer pays the business for the product.

expert. There is also no dispute that some of that revenue was earned by selling AGS product, for which ISG paid AGS about $66,000 and still owes AGS at least $7,500. Pl.'s Ex. 13, PageID.1510. The remaining question is whether ISG also sold roughly $938,481 of AGS product without paying AGS for it, or if that revenue was derived from other sources.

Plaintiff's expert affidavit states that the product at issue was, in fact, AGS product. Bagalis Aff. ¶¶ 36, 57. The expert indicates that his review of AGS financial documents allowed him to identify transactions "where AGS's product was released for shipment to AGS's customers with ISG identified as the entity that received or was responsible for payment to AGS." *Id.* ¶ 30. He was able to confirm the existence of direct shipments of AGS product sold by ISG by reviewing AGS documentation and cross-checking it with non-party shipping records. *Id.* at ¶ 28. Though the exact quantity of product eventually released could not always be substantiated due to missing shipping record documentation, these were all transactions where AGS product was shipped but ISG was paid. *Id.* ¶ 30.

What, if any, evidence contradicts Plaintiff's claim? Defendants argue that Plaintiff "has not and cannot identify the product that was actually taken" while Defendants can show what product they have

11

already paid AGS for and what ISG still owes.[4] ECF No. 39, PageID.1821; *see also* ¶¶ 38-42, PageID.1814-15. In support of this claim, Defendants point to their Exhibits C and D. Exhibit C is titled "Matched Purchase Orders, Bills of Lading, and Invoices from non-party records," and shows purchases orders and bills of lading with matching "paid in full" invoices indicating that ISG paid AGS for certain products contained on the list. However, there is no evidence put forward that "paid in full" indicates "paid in full *to AGS*." This could simply be a notation that the customer in question paid ISG. And even if all of these documents corresponded to instances where ISG had in fact paid AGS for product,[5] the documents provided in this Exhibit do not sum to $900k+ worth of product. This evidence cannot account for all the product that Plaintiff is specifically referring to in this claim.

Exhibit D is titled "ISG Total Sales (Including Non-AGS Sales)" and is a list of numbers and dates of sales over the life of ISG's business, with

---

[4] There is no question ISG owes AGS *some* money. Defendants admit this in their reported total sales numbers. Defs.' Ex. D, ECF No. 39-1, PageID.1896. But Plaintiff's claim for summary judgment is specifically as to a certain quantity of AGS products that SG alleges it never sold, and so the analysis must focus there.

[5] Predictably, it is unclear that they do. For example, a May 4, 2017 invoice to company FFT is marked "paid in full" in Defendants' exhibit (ECF No. 39-1, PageID.1872). The expert affidavit's supporting documentation indicates that this transaction was not accompanied by any check from ISG to AGS. *See* Line 54, Bagalis Aff. Ex. 1, ECF No. 38-1, PageID.1251.

an accounting indicating how much of the total sales made by ISG were for AGS products versus non-AGS products. At oral argument, counsel for Defendants indicated that this document came from an accounting software and that it was provided to him by the Defendants. But the list is entirely conclusory: it does not provide any factual documentation to support the claim that the sales listed as non-AGS products were, in fact, related to products made by someone else. On their own, Defendants do not provide any documentation or receipts from purchases to third party entities, and neither Kola nor Papa could clearly describe any purchases from third party entities in their depositions.[6] Given this context and the lack of supporting documentation, there is no "reasonable inference" the Court can draw from Exhibit D that ISG ever sold non-AGS products.

Plaintiff is not lacking proof about the "product that was actually taken"; meanwhile, Defendants cannot offer any evidence that creates an issue of material fact as to whether it sold almost $1 million of AGS product without paying for it. Plaintiff's motion as to the claim for common law conversion is therefore granted.[7]

---

[6] In its Reply, Plaintiff attaches records produced in discovery by Defendants that purport to be invoices from a Chinese company. ECF 40, PageID.1997-2017. Because Defendants did not adduce this evidence in response to the motion, and because the invoices do not contradict the records showing ISG's sales of AGS's products, the Court will not consider them.

[7] Defendants also make a brief argument that cites to case law specifically discussing conversion of money. ECF No. 39, PageID.1823.

## B. Statutory conversion (Count V)

Plaintiff also seeks summary judgment as related to statutory conversion. This claim is brought under MCL 600.2919a, which provides that an entity can recover treble damages in the case of:

> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Plaintiff's claim is brought under Section (a): it claims that Defendants embezzled the $900k+ of product. ECF No. 38, PageID.795-99. Each of the three actions (stealing, conversion, and embezzlement) in Section (a) have distinct proofs. *Shiffman v. Auto Source Wholesale, LLC*, No. 339291, 2018 WL 3863471, at *2 (Mich. Ct. App. Aug. 14, 2018) ("Any of the three alternatives are sufficient to recover."). The elements of an embezzlement claim are as follows:

> (1) the money in question must belong to the principal, (2) the defendant must have a relationship of trust with the principal

---

Courts have held conversion of money can only be shown if a defendant obtained the money "without the owner's consent to the creation of a debtor-creditor relationship" and had "an obligation to return the specific money entrusted to his care." *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct. App. 1999). But this mischaracterizes Plaintiff's position, which is that the conversion was of "$938,481 of product." Any Michigan precedents regarding conversion of money therefore do not apply.

14

>as an agent or employee, (3) the money must come into the defendant's possession because of the relationship of trust, (4) the defendant dishonestly disposed of or converted the money to his own use or secreted the money, (5) the act must be without the consent of the principal, and (6) at the time of conversion, the defendant intended to defraud or cheat the principal.

*Cabala v. Allen*, No. 305250, 2012 WL 4465164, at *3 (Mich. Ct. App. Sept. 27, 2012) (quoting *People v. Lueth*, 660 N.W.2d 322 (Mich. Ct. App. 2002)).

Defendants assert that there is no evidence to prove (5) that anything they did occurred without consent of Wiebe and (6) that they intended to defraud Wiebe. ECF No. 39, PageID.1823-26. As to element (5), whether the act of embezzlement was without the consent of the owner, the Court has already indicated that there is no genuine issue of material fact regarding a contract or permission to "resell" as defined by Defendants' actions. There is also deposition testimony from Wiebe that he did not authorize Defendants to resell. Therefore, there is sufficient evidence that Wiebe would not have approved of their actions. Regarding an intent to defraud or cheat, that element is demonstrated by the uncontested course of conduct: Defendants did not affirmatively inform Mr. Wiebe that they had created ISG or that they were selling AGS products to existing AGS customers and keeping the proceeds, and there is no evidence that they ever had an intent to do so or to operate their business "above-board." They reference their long history at the company

15

as raising a question of fact about their intent, but if anything the fact that they took advantage of their insider positions within the company to carry out this plan would indicate the opposite. Plaintiff's motion for summary judgment on the claim for statutory conversion is also granted.

## CONCLUSION

For the reasons stated, Plaintiff's Partial Motion for Summary Judgment (ECF No. 14) is **GRANTED.** Because other claims remain in the case, it is not dismissed at this time.

It is **FURTHER ORDERED** that within twenty-one (21) days of this Order, Plaintiff shall file a motion justifying its request for an award of monetary damages and attorney's fees per its Complaint and MCL 600.2919a, supported by any relevant documentation. Defendants may respond to Plaintiff's motion within fourteen (14) days of its filing. The Court then will decide the motion and enter a judgment that includes the damages to which it finds Plaintiffs entitled.

**IT IS SO ORDERED**, this 22nd day of August, 2022.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge